UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANTONIO VILLASENOR,

             Petitioner,

    v.

MICHAEL MARTEL,

             Respondent.

No.  2:09-cv-2324-TLN-EFB P

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner proceeding pro se with a first amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges his May 18, 2005, Sacramento County Superior Court conviction on numerous counts based on his involvement in a large-scale drug trafficking enterprise.  Upon careful consideration of the record and the applicable law, it is recommended that petitioner's application for habeas corpus relief be denied.

**I. Background**

In its partially published memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> **PROCEDURE**
>
> By indictment and later amendments to the indictment, [co-defendant Jason] Tolliver and Villasenor were charged, along with 13 others.  The counts applicable to Tolliver and Villasenor were as follows:

1

• Count one (Tolliver and Villasenor), conspiracy to transport cocaine between noncontiguous counties (Health & Saf. Code, § 11352, subd. (b); Pen.Code, § 182, subd. (a)(1)), with the following additional allegations: (1) the offense involved more than 40 kilograms of cocaine (Health & Saf. Code, § 11370.4, subd. (a)(5)); (2) Villasenor and Tolliver were substantially involved in the planning, direction, execution or financing of the underlying offense (Health & Saf. Code, § 11370.4, subd. (a)); (3) a principal was armed with a firearm during the commission of the offense (Pen.Code, § 12022, subd. (a)(1)); (4) Villasenor induced others to participate in the offense or occupied a position of leadership in its commission (Cal. Rules of Court, rule 4.421(a)(4));

• Count two (Villasenor), conspiracy to use a minor to transport cocaine (Health & Saf. Code, § 11353, subd. (b); Pen.Code, § 182, subd. (a)(1));

• Count four (Tolliver and Villasenor), conspiracy to transport and sell cocaine (Health & Saf. Code, § 11352, subd. (a); Pen.Code, § 182, subd. (a)(1)), with the additional allegation that a principal was armed during the commission of the offense (Pen.Code, § 12022, subd. (a)(1));

• Count five (Tolliver and Villasenor), conspiracy to transport and sell methamphetamine (Health & Saf. Code, § 11379, subd. (a); Pen.Code, § 182, subd. (a)(1)), with the additional allegation that a principal was armed during the commission of the offense (Pen.Code, § 12022, subd. (a)(1));

• Count six (Tolliver and Villasenor), sale of methamphetamine (Health & Saf. Code, § 11379, subd. (a));

• Count eight (Villasenor), sale of cocaine (Health & Saf. Code, § 11352, subd. (a));

• Count eleven (Villasenor), possession of a false compartment to conceal a controlled substance (Health & Saf. Code, § 11366.8, subd. (a));

• Count twelve (Villasenor), possession of a false compartment to conceal a controlled substance (Health & Saf. Code, § 11366.8, subd. (a));

• Count thirteen (Tolliver), possession of methamphetamine for sale (Health & Saf. Code, § 11378), with an additional allegation that he possessed the methamphetamine in crystalline form (Pen.Code, § 1170.74); and

• Count fourteen (Tolliver), possession of cocaine (Health & Saf. Code, § 11350, subd. (a)).

An amendment to the indictment further alleged that Tolliver was convicted of two prior serious felonies: a 1992 conviction for brandishing a firearm against a person in a motor vehicle and a 1992 conviction for assault with a firearm.

A jury found Tolliver guilty on counts four, five, six, thirteen, and fourteen. It found true the allegation that he possessed methamphetamine in crystalline form, but found not true the arming allegations. The jury was unable to reach a verdict on count one, as to which the trial court declared a mistrial and later dismissed on the prosecution's motion. The jury found that Tolliver had two prior convictions, and the court found that those prior convictions were for serious felonies.

The same jury found Villasenor guilty on all counts alleged against him except count six, on which the jury found Villasenor not guilty. The jury also found true all of the additional allegations relating to Villasenor.

* * *

At Villasenor's sentencing, the trial court imposed the upper term of nine years for count one, plus consecutive 20–year and one-year terms for the weight and arming enhancements, respectively. The court imposed the middle term for each of the remaining counts and either stayed the term pursuant to Penal Code section 654 or made the term concurrent to the term imposed for count one. Villasenor's total determinate term was 30 years.

**FACTUAL BACKGROUND**

Because of the nature of the defendants' contentions on appeal, it is unnecessary to recount the details of the two-year investigation of the crimes. We therefore provide only a brief summary of the illegal activities in which Tolliver and Villasenor engaged and add details, as needed, in the discussion of their contentions on appeal.

An investigation conducted by a multi-agency task force uncovered a large drug-trafficking operation that, among other illegal activities, sought to transport large quantities of cocaine from Texas to Sacramento. Using numerous investigative techniques, such as informants, searches, visual surveillance, and wiretapping, the investigators were able to identify Tolliver and Villasenor as participants in the illegal activities. Villasenor, along with John Quintero, was at the head of the organization, while Tolliver distributed controlled substances.

In early 2002, the investigation revealed trips between Texas and Sacramento on behalf of the trafficking operation. Jesse Vasquez, who worked under Villasenor in the organization, sent Sandra Cortez, a load car driver from Sacramento, on two trips to Texas and back. After Cortez's trips, Vasquez sent Joseph Duarte, another load car driver, to Texas in a Chrysler Concorde that had a false compartment installed in the trunk. While waiting in Texas for the directive to return to Sacramento, Duarte got cold feet and returned to Sacramento, leaving the Concorde in Texas. Other recruits took over and started the trip back to Sacramento in the Concorde and a maroon Lincoln.

On May 16, 2002, the investigators, who had tracked the Concorde as it traveled, arranged for law enforcement in Texas to stop the Concorde and Lincoln.  The resulting search revealed about 49 kilograms of cocaine stashed in the false compartment of the Concorde.  On the same day, Villasenor's home was searched, as well as a vehicle in his driveway.  A firearm was found in the vehicle.  Tolliver's residence was also searched that day, and a significant amount of methamphetamine was found.

*People v. Tolliver, et al.,* 160 Cal.App.4th 1231, 1233-1236 (2008).

After the California Court of Appeal affirmed petitioner's judgment of conviction, he filed a petition for review in the California Supreme Court.  Resp't's Lodg. Doc. entitled "California Supreme Court, Petition for Review, April 23, 2008."  That petition was summarily denied. Resp't's Lodg. Doc. entitled "California Supreme Court Denial of the Petition for Review; June 18, 2008."

Petitioner subsequently filed a petition for a writ of habeas corpus in the Sacramento County Superior Court.  Resp't's Lodg. Doc. entitled "Sacramento County, Petition for Writ of Habeas Corpus, March 23, 2010."  The Sacramento County Superior Court denied that petition in a reasoned decision on the merits of petitioner's claims.  Resp't's Lodg. Doc. entitled "Sacramento County Order Denying Petition for Writ of Habeas Corpus, April 19, 2010."

Petitioner next filed a petition for writ of habeas corpus in the California Court of Appeal. Resp't's Lodg. Doc. entitled "Third Appellate District Court of Appeal, Petition for Writ of habeas Corpus, May 14, 2010."  That petition was summarily denied.  Resp't's Lodg. Doc. entitled "Third Appellate District Court of Appeal Order Denying Petition for Writ of Habeas Corpus, June 10, 2010."

Finally, petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  Resp't's Lodg. Doc. entitled "California Supreme Court, Petition for Writ of Habeas Corpus, March 29, 2011."  That petition was also summarily denied.  Resp't's Lodg. Doc. entitled "California Supreme Court Order Denying Petition for Writ of habeas Corpus, October 12, 2011."

/////

/////

1    **II.  Standards of Review Applicable to Habeas Corpus Claims**

2           An application for a writ of habeas corpus by a person in custody under a judgment of a

3    state court can be granted only for violations of the Constitution or laws of the United States.  28

4    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

5    application of state law.  *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502

6    U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

7           Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

8    corpus relief:

9           An application for a writ of habeas corpus on behalf of a person in custody pursuant to the

10   judgment of a State court shall not be granted with respect to any claim that was adjudicated on

11   the merits in State court proceedings unless the adjudication of the claim -

12          (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

13   clearly established Federal law, as determined by the Supreme Court of the United States; or

14          (2) resulted in a decision that was based on an unreasonable determination of the facts in

15   light of the evidence presented in the State court proceeding.

16          For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

17   holdings of the United States Supreme Court at the time of the last reasoned state court decision.

18   *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

19   ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.*

20   *Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

21   what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*,

22   633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

23   precedent may not be "used to refine or sharpen a general principle of Supreme Court

24   jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  *Marshall*

25   *v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155

26   (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so

27   widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

28   be accepted as correct.  *Id.*  Further, where courts of appeals have diverged in their treatment of

1   an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

2   *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

3           A state court decision is "contrary to" clearly established federal law if it applies a rule

4   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

5   precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

6   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

7   writ if the state court identifies the correct governing legal principle from the Supreme Court's

8   decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1]  *Lockyer v.*

9   *Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002

10  (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

11  court concludes in its independent judgment that the relevant state-court decision applied clearly

12  established federal law erroneously or incorrectly.  Rather, that application must also be

13  unreasonable."  *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473

14  (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

15  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

16  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

17  'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v.*

18  *Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

19  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

20  must show that the state court's ruling on the claim being presented in federal court was so

21  lacking in justification that there was an error well understood and comprehended in existing law

22  beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 103.

23          If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

24  court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

25  527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

26  _____

27      [1]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding."  *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,

28  384 F.3d 628, 638 (9th Cir. 2004)).

1   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

2   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

3   de novo the constitutional issues raised.").

4        The court looks to the last reasoned state court decision as the basis for the state court

5   judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If

6   the last reasoned state court decision adopts or substantially incorporates the reasoning from a

7   previous state court decision, this court may consider both decisions to ascertain the reasoning of

8   the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

9   a federal claim has been presented to a state court and the state court has denied relief, it may be

10  presumed that the state court adjudicated the claim on the merits in the absence of any indication

11  or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99.  This presumption

12  may be overcome by a showing "there is reason to think some other explanation for the state

13  court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

14  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

15  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

16  the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___, ___, 133

17  S.Ct. 1088, 1091 (2013).

18       Where the state court reaches a decision on the merits but provides no reasoning to

19  support its conclusion, a federal habeas court independently reviews the record to determine

20  whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.

21  Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

22  review of the constitutional issue, but rather, the only method by which we can determine whether

23  a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.  Where no

24  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

25  reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

26       A summary denial is presumed to be a denial on the merits of the petitioner's claims.

27  *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

28  just what the state court did when it issued a summary denial, the federal court must review the

1    state court record to determine whether there was any "reasonable basis for the state court to deny

2    relief." *Richter*, 562 U.S. at 98.  This court "must determine what arguments or theories ... could

3    have supported, the state court's decision; and then it must ask whether it is possible fairminded

4    jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

5    decision of [the Supreme] Court." *Id.* at 786.  The petitioner bears "the burden to demonstrate

6    that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d

7    925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

8       When it is clear, however, that a state court has not reached the merits of a petitioner's

9    claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

10    habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

11    F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

12    **III.  Petitioner's Claims**

13          **A.  Fourth Amendment**

14       Petitioner claims in his first ground for relief that he "had a privacy interest in the

15    Chrysler Concorde."  First Amended Petition (ECF No. 17), at 73.[2]  In his second claim for relief,

16    he argues that "failure to obtain another warrant authorizing the seizure of the Concorde to

17    reinstall the GPS tracking device taints all evidence obtained thereafter, requiring its suppression

18    as fruits of the poisonous tree." *Id.* at 89.  He claims in his third ground for relief that "the GPS

19    tracking device could not be used after its authority expired on April 20." *Id.* at 96.

20       The background to these three claims was described by the California Court of Appeal, as

21    follows:

22          **Privacy Interest in Concorde**

23          Villasenor moved to suppress evidence obtained as a result of law
          enforcement's seizure of his 1993 Chrysler Concorde and
24          installation of a GPS tracking device and subsequent tracking of the
          Concorde.  The trial court denied the motion.  It concluded that
25          Villasenor did not have a reasonable expectation of privacy in the
          Concorde because he disassociated himself from the Concorde to
26          avoid having it connected to him in the event it was discovered

27    ───────────────────

      [2]  Page number citations to the amended petition are to the page numbers placed on the
28    petition by petitioner.

during its use in the drug trafficking.  Villasenor argues, on appeal, that the trial court's denial of the motion to suppress was error because Villasenor owned the Concorde and therefore had a privacy interest in it.  We agree with the trial court that, under the circumstances of this case, Villasenor did not have a legitimate expectation of privacy in the Concorde. (footnote omitted.)

**A.  Facts and Procedure**

On March 21, 2002, Villasenor sent his brother, Raymond, to Grass Valley to purchase a 1993 Chrysler Concorde that Villasenor had read about in a newspaper advertisement.  He gave Raymond money, about $3,000 in cash, for the purchase.  Villasenor did not sign any paperwork for the car and his name was not listed on the pink slip. Raymond's name was listed on the pink slip and the release of liability.  Villasenor did not register the car with the Department of Motor Vehicles, and he did not obtain insurance under his name.  He followed this procedure because he intended to use the car to transport controlled substances and he did not want the car associated with himself in any way.  He knew that Duarte, the load car driver, would be taking the car to Texas, and he did not want the car to be associated with him if Duarte was caught and the car was searched. (fn omitted.)

Through its investigation of Villasenor's drug-related activities, the Sacramento County Sheriff's Department concluded Villasenor and his coconspirators would use the Concorde as a load car to transport controlled substances.  On this basis, the trial court issued a search warrant authorizing entry into the Concorde and installation of a GPS tracking device.  The warrant also authorized the tracking device to remain in place for 10 days to transmit information to law enforcement and delayed for 10 days the sheriff's department's duty to notify the owner of the search.

Villasenor sent the Concorde to an automobile body shop to have a secret compartment installed.   The proprietor of the shop cooperated with the sheriff's department and provided access to the car. The tracking device was installed in the Concorde on April 11, 2002, but it was thereafter determined that the signal was too weak.  On April 12, the shop proprietor drove the Concorde to a supermarket parking lot where an officer entered the car again and installed a new antenna.  No new warrant was obtained for the second entry.  Three times, on April 19, April 29, and May 9, the sheriff's department obtained a court order extending by 10 days the time within which law enforcement was required to notify the owner about the search.  On May 16, the Concorde, having been tracked to Texas, was stopped there and controlled substances were found during a search.

Villasenor filed a motion to suppress the evidence obtained by tracking the Concorde.  In support, he filed, among other things, his own declaration asserting his ownership of the Concorde.  After an evidentiary hearing in which Villasenor testified, the trial court denied the motion.  In doing so, the court provided an extensive analysis of the issue of standing – whether Villasenor had a

1
2

> legitimate expectation of privacy.  Finding Villasenor had no
> standing, the court did not make any factual determinations or
> provide analysis beyond that necessary to the standing issue.

3
4
5
6
7

> The trial court reasoned that, although Villasenor owned the car,
> having paid for it and never relinquished ownership, he took several
> steps to distance himself from the car.  The purpose of this
> disassociation was to prevent law enforcement from determining
> that he was involved if the car was stopped and controlled
> substances were found.  Because Villasenor purposefully distanced
> himself from the car to avoid detection, the law, according to the
> trial court's reasoning, does not recognize his expectation of privacy
> as legitimate.

8

*Tolliver, et al.,* 160 Cal.App.4th at 1237-1238.

9
10
11
12
13
14
15
16

The California Court of Appeal agreed with the trial court that petitioner had forfeited his privacy interest in the Concorde through his actions in attempting to avoid detection and prosecution for his crimes.  *Id.* at 1238-41.  Because of its conclusion that petitioner had no legitimate expectation of privacy in the Concorde, the Court of Appeal also rejected petitioner's claims that evidence obtained as a result of the installation of the GPS tracking system in the Concorde must be suppressed because the officers did not obtain a warrant to reenter the Concorde and install a new antenna, and because the GPS tracking system was used after the warrant authorizing its use had expired.  *Id.* at 1241, n.10.

17
18
19
20
21
22
23
24
25
26
27
28

In his first three claims for relief in the petition before this court, petitioner is arguing, in essence, that the trial court erred when it found he had no standing to challenge the search of the Concorde and, further, that the search of the Concorde violated his Fourth Amendment rights. These claims are not cognizable in this federal habeas corpus action.  The United States Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976).  There is no evidence before the court that petitioner did not have a full and fair opportunity to litigate his Fourth Amendment claims in state court. On the contrary, petitioner filed a motion to suppress in the trial court and received a hearing on that motion, including an evidentiary hearing at which he testified.  Petitioner also raised his Fourth Amendment claims on appeal and received a decision on those claims.  Because petitioner

10

had a fair opportunity to and did, in fact, litigate his Fourth Amendment claims in state court, his Fourth Amendment claims are barred in this federal habeas proceeding. *Stone*, 428 U.S. at 494; *Gordon v. Duran*, 895 F.2d 610, 613-14 (9th Cir. 1990) (petitioner had a full and fair opportunity to litigate his Fourth Amendment claims in state court where he was entitled to file a motion to suppress pursuant to Cal. Penal Code § 1538.5.).

### B. Issuance of the Wiretap

In his next ground for relief, petitioner claims that the wiretap employed by state authorities violated the California and federal wiretap statutes. ECF No. 17 at 99-113. Petitioner raised the identical claim on direct appeal. Resp't's Lodg. Doc. entitled "Third Appellate District Court of Appeal, Appellant's Opening Brief, June 5, 2006," at 58-72. The California Court of Appeal described petitioner's claim and its ruling thereon, as follows:

> **Propriety of Wiretapping Orders**
>
> Although California law generally prohibits wiretapping, both state and federal law allow wiretapping to investigate specific serious crimes. (*People v. Leon* (2007) 40 Cal.4th 376, 383 (*Leon*).) Section 629.52 allows a court to authorize a wiretap if both a probable cause element and a necessity element are present. Villasenor does not contend the probable cause element was lacking (footnote omitted). He claims that Detective Robin Kolb's affidavit, filed in support of the application for the wiretapping order, failed to establish the necessity element, namely, that "[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous." (§ 629.52, subd. (d); *Leon, supra*, at p. 384.) "With respect to necessity, the sole issue presented here, state law and federal law employ identical language. Each requires the judge, before authorizing a wiretap, to find that normal investigative techniques 'have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.' (18 U.S.C. § 2510(3)(c); *see* Pen. Code, § 629.52(d).)" (*Leon, supra*, 40 Cal.4th at pp. 384-385.) We review the issuance of a wiretapping order for abuse of discretion only (footnote omitted). (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1204.)
>
> "The requirement of necessity is designed to ensure that wiretapping is neither 'routinely employed as the initial step in criminal investigation' [citation] nor 'resorted to in situations where traditional investigative techniques would suffice to expose the crime.' [Citation.] The necessity requirement can be satisfied 'by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case.' [Citation.] As numerous courts have explained, though, it is not necessary that law enforcement officials exhaust every

11

conceivable alternative before seeking a wiretap.   [Citations.]
Instead, the adequacy of the showing of necessity "'is 'to be tested
in a practical and commonsense fashion,' . . . that does not 'hamper
unduly the investigative powers of law enforcement agents.'"'
[Citation]  A determination of necessity involves "'a consideration
of all the facts and circumstances.'" [Citation.]"  (*Leon, supra*, 40
Cal.4th at p. 385 [citing federal decisions].)

**A.  Facts and Procedure**

On April 2, 2002, Detective Kolb filed an 89-page affidavit in
support of her application for an order authorizing interception of
communications using telephones associated with Villasenor and
others.   The detective set forth (1) details of the two-year
investigation leading up to the application, (2) the goals of the
investigation that had not been achieved through techniques other
than wiretapping, (3) the reasons why a wiretapping order was
necessary, and (4) her opinion that probable cause supported a
wiretapping order.

In March 2000, an informant (CI-1) told Detective Kolb that
Villasenor had sold the informant significant amounts of
methamphetamine.   CI-1 stated that Villasenor sold
methamphetamine, cocaine, and heroin out of his business (River
City Auto Specialists) and his residence.[3]  Surveillance of known
drug traffickers established that they went to River City Auto
Specialists on numerous occasions.  They never stayed long and did
not appear to conduct auto repair related business.   Analysis of
telephone records showed numerous calls between known
traffickers and River City Auto Specialists.  Detective Kolb went to
River City Auto Specialists undercover and asked for an estimate
for a repair.  While she was there, she observed multiple men that
appeared to be having a meeting.  None of them were dressed as or
appeared to be auto mechanics.

Through other sources, Detective Kolb became aware that Tolliver
was also involved in trafficking of controlled substances.
Telephone records showed that, on many occasions, Tolliver made
calls to or received calls from River City Auto Specialists.
Surveillance revealed Tolliver's visits to the same place, even
though following him was often difficult because he used a
significant amount of counter-surveillance driving techniques.
Further investigation revealed other drug traffickers who could be
connected with River City Auto Specialists.

As the investigation continued over the next two years, numerous
informants were used and attempts were made to infiltrate the
organization.   Law enforcement arrested 19 people, conducted
surveillance on 13 separate occasions, and searched arrestees and
locations affiliated with the investigation without gaining the
information it needed to determine the extent of the organization, its

[3]   River City Auto Specialists was later known by two other names, Tranny Guys and
Performance Auto Body and Paint.

sources, and its activities.  Although law enforcement continued to gather information about the organization, the attempts to infiltrate were unsuccessful.  The organization was close-knit and family-run, making it difficult to gain information on the extent of the organization or its activities.  The organization used several layers of participants to shield the identity of upper echelon participants, and numerous locations were used to store the controlled substances and money.  The participants in the organization were vigilant about law enforcement detection.  They used counter-surveillance techniques and periodically suspended their activities when they suspected they were being watched.  Because of these conditions, Detective Kolb had been unable to learn the full extent of the organization and its many participants.

In her affidavit, Detective Kolb identified 10 goals of the investigation that she had not yet accomplished through the investigative techniques already used.  They were to identify:

1) all participants,

2) locations used to facilitate sales and distribution,

3) methods used by the participants,

4) locations to which substances were distributed,

5) means of transporting controlled substances,

6) communications devices used,

7) dates, times, and places for transactions, as well as the quantity and price of the controlled substances for sale,

8) location of assets accumulated by the organization,

9) location of records of the organization, and

10) admissible proof of intent of each participant.

Detective Kolb discussed different investigative techniques (such as (1) use of confidential informants and undercover agents, (2) surveillance, (3) telephone records, (4) grand jury investigation and interviews, and (5) search and arrest warrants) and discussed why these would not be sufficient to achieve the goals of the investigation.  She also explained how any authorized wiretap would be minimized to avoid, as possible, interception of communications not related to the investigation.

Based on Detective Kolb's affidavit, the trial court authorized the wiretap of Villasenor's cell phone, along with other phones owned by other participants in the organization.

Villasenor moved to suppress the fruits of the wiretap, asserting that Detective Kolb's affidavit did not establish the necessity of the wiretap of Villasenor's cell phone because other investigative

techniques were potentially productive and not unduly dangerous. The trial court denied the motion, providing a lengthy analysis of why Detective Kolb's affidavit showed the wiretap was necessary.

**B. Necessity of Wiretap**

On appeal, Villasenor renews his argument that Detective Kolb's affidavit did not sufficiently show necessity – that is, that conventional investigative techniques were insufficient to attain the goals of the investigation.  We find no merit in this contention and conclude that issuance of the wiretap order was not an abuse of discretion.

Villasenor's argument consists of (1) his criticism of the efforts of Detective Kolb and the other investigators, claiming that they could have obtained more information if they had taken certain actions, and (2) his assertion that the goals stated in Detective Kolb's affidavit were unreasonable and unattainable.  Each element of Villasenor's argument is without merit.[4]

Villasenor asserts, as the bulk of his argument, several ways that he believes Detective Kolb could have obtained more information about the organization without wiretapping his phone.  These suggestions include:

using an informant or others whose names had not been disclosed as informants,

arresting those who had been identified as affiliated with the organization and turn them into informants,

arranging a "reverse sting,"

arranging more purchases of cocaine,

searching the River City Auto Specialists location,

arresting Villasenor to induce him to give information about the entire organization,

doing a parole search on Villasenor's brother,

obtaining better optical equipment (responding to Detective Kolb's

---

[4]   Villasenor also argues that "there is no justification for the subsequent extension of the initial wire and electronic intercepts, and insofar as the Kolb's [sic] affidavit is tainted by these intercepts, the information contained in the subsequent applications and affidavits must be excised and the evidence derived therefore must be suppressed. [Citation.]"  Because Villasenor provides no explanation for this assertion of a "subsequent extension" and no citation to the record for such an extension, we have nothing upon which to base the requested review.  In any event, we conclude Detective Kolb's application sufficiently showed necessity and, therefore, any subsequent extension would have not been tainted by evidence obtained by wiretapping pursuant to an order based on Detective Kolb's affidavit.

assertion that people could not always be identified during surveillance), and searching known suspects and known locations.

In light of the extensive investigation undertaken before Detective Kolb applied for the wiretapping order, Villasenor's suggestions concerning what law enforcement could have done further are unavailing.   As noted above, "it is not necessary that law enforcement officials exhaust every conceivable alternative before seeking a wiretap.   [Citations.]   Instead, the adequacy of the showing of necessity '"is 'to be tested in a practical and commonsense fashion,' . . . that does not 'hamper unduly the investigative powers of law enforcement agents.'"'  [Citation" (*Leon, supra*, 40 Cal.4th at p. 385.)  Applying such a practical and commonsense approach, it is clear the court did not abuse its discretion by granting the application to wiretap Villasenor's cell phone.  Visual surveillance had been helpful but had not answered many of the questions that arose during the investigation, such as the extent of the organization, the location of controlled substances, assets, and records, and the timing and location of transactions. Further searches and arrests would have alerted the organization to the magnitude of the investigation and would have made it impossible to continue the investigation.  Confidential informants had been used, but the information they were able to obtain was limited.  After two years of investigation, law enforcement could and did show the necessity of wiretapping.   Under these circumstances, Villasenor's suggestions of possible alternative modes and means of investigation are insufficient to establish that the court abused its discretion.

Villasenor's contention that the goals of the investigation, as stated by Detective Kolb, were unattainable is likewise unavailing. Villasenor contends that "it was virtually impossible for any set of investigative tools, including wiretap, to succeed." He notes that, even with the wiretap, the investigation never revealed the source of the organization's cocaine and amphetamine.   Nonetheless, the wiretap goals, as state above, were reasonable.  The investigation, up to the time when Detective Kolb sought the wiretap order, revealed that this was a large-scale operation, many aspects of which remained undiscovered.  The wiretap goals related to valid law enforcement concerns and were designed to uncover as much of this illicit organization as possible.

If the investigation had continued using conventional investigative techniques without wiretapping, it is apparent that it would have continued to reveal only the edges of the organization – a buy here, a meeting there – without exposing the core of the organization. This case shows how wiretapping, as authorized by state and federal statutes, can be used as a proper investigative tool.  The court did not abuse its discretion in authorizing the wiretap.

Resp't's Notice of Lodging, "Third Appellate District Court of Appeal, Partially Published

Opinion, March 11, 2008," at 30-39.

/////

1    Petitioner's claim that the wiretap conducted in this case violated state law is not

2    cognizable in this federal habeas action.  As set forth above, a federal writ is not available for

3    alleged error in the interpretation or application of state law.  *Wilson*, 562 U.S. at 5; *Estelle*, 502

4    U.S. at 67-68.  An application for a writ of habeas corpus by a person in custody under a

5    judgment of a state court can be granted only for violations of the Constitution or laws of the

6    United States.  28 U.S.C. § 2254(a).

7    To the extent petitioner is arguing that the wiretap violated his Fourth Amendment rights,

8    his claim is barred by *Stone v. Powell,* 428 U.S. at 494.  Petitioner was accorded an opportunity

9    for full and fair litigation of his Fourth Amendment claim that the wiretap was obtained without

10    satisfying the necessity requirement, and petitioner actually presented this claim to the state trial

11    and appellate courts.  This precludes federal habeas relief on the ground that evidence obtained

12    through the wiretap in an allegedly unconstitutional search and seizure was introduced at his trial.

13    *See Fernandez v. Busby*, 27 F. Supp. 3d 1046 (C.D. Cal. 2014) (denying petitioner's claim that

14    the trial court's summary denial of his motion to suppress the wiretaps was prejudicial, relying on

15    *Stone*).

16    Petitioner's direct challenge to the issuance of the wiretap under federal law also fails.  A

17    claim for habeas review under Title III of the Omnibus Crime Control and Safe Streets Act of

18    1968, 18 U.S.C. § 2510, is not cognizable if "the claim does not involve an 'error of the character

19    or magnitude' to justify habeas relief."  *Lord v. Lambert*, 347 F.3d 1091, 1094 (9th Cir. 2003)

20    (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).  A Title III claim involves such an error

21    only if there is "'a fundamental defect which inherently results in a complete miscarriage of

22    justice,' or 'an omission inconsistent with the rudimentary demands of fair procedure,'" and the

23    error "'present[s] exceptional circumstances where the need for the remedy afforded by the writ

24    of habeas corpus is apparent.'"  *See id.*  "A full and fair opportunity to argue for suppression of

25    information obtained through a wiretap at both the trial and appellate levels is inconsistent with

26    an omission contrary to the rudimentary demands of fair procedure."  *Roberts v. Cate*, No. 11-cv-

27    2869-L(WMc), 2013 WL 3973079, at * 2 (S.D. Cal. Aug. 1, 2013) (federal habeas claim that the

28    state failed to comply with federal and state wiretap procedures not cognizable where petitioner

1  failed to show the admission of wiretap evidence resulted in a complete miscarriage of justice or a

2  denial of fair procedure).

3        For the reasons described by the California Court of Appeal, the trial court's authorization

4  of a wiretap did not result in a complete miscarriage of justice in this case.  There is no evidence

5  that the wiretap evidence was unreliable or that petitioner is not guilty of the crimes with which

6  he has been convicted.  Under the circumstances presented here, petitioner does not state a

7  cognizable federal claim as to the admissibility of wiretap evidence.  *Lord*, 347 F.3d at 1094-95;

8  *Sands v. Lewis*, No. 11-18026, 511 F. App'x 608, 610, 2013 WL 704035, at *2 (9th Cir. Feb. 27,

9  2013) ("We do not have jurisdiction over this claim because Sands does not assert the violation of

10  a constitutionally protected right; he asserts only that the wiretap evidence was obtained in

11  violation of a federal statute); *Ewell v. Scribner*, No. 11-15388, 490 F. App'x 891, 893, 2012 WL

12  3110462, at *1 (9th Cir. Aug. 1, 2012) (petitioner's federal habeas claim that his rights under

13  federal wiretap statute were violated by the state not cognizable where petitioner had a full and

14  fair opportunity to litigate his claims in state court, and where he failed to demonstrate that the

15  error was "'a fundamental defect which inherently results in a complete miscarriage of justice [or]

16  an omission inconsistent with the rudimentary demands of fair procedure,'" or that the evidence

17  used against him at trial was otherwise unreliable).

18        For the foregoing reasons, petitioner is not entitled to federal habeas relief on his claim

19  that the wiretap employed by state authorities violated the California and federal wiretap statutes.

20        **C.  Sufficiency of the Evidence**

21        Petitioner raises three claims of insufficient evidence to support his convictions.  After

22  setting forth the applicable legal principles, the court will address each of these claims in turn

23  below.

24        **1.  <u>Applicable Legal Standards</u>**

25        The Due Process Clause "protects the accused against conviction except upon proof

26  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

27  charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a

28  conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

17

1  rational trier of fact could have found the essential elements of the crime beyond a reasonable

2  doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under

3  Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a

4  reasonable doubt.'"  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443

5  U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground

6  of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos*

7  *v. Smith*, ___ U.S. ___, 132 S.Ct. 2, *4 (2011).  Sufficiency of the evidence claims in federal

8  habeas proceedings must be measured with reference to substantive elements of the criminal

9  offense as defined by state law.  *Jackson*, 443 U.S. at 324 n.16.

10  In conducting federal habeas review of a claim of insufficient evidence, "all evidence

11  must be considered in the light most favorable to the prosecution." *Ngo v. Giurbino*, 651 F.3d

12  1112, 1115 (9th Cir. 2011).  "*Jackson* leaves juries broad discretion in deciding what inferences

13  to draw from the evidence presented at trial," and it requires only that they draw "'reasonable

14  inferences from basic facts to ultimate facts.'"  *Coleman v. Johnson*,___ U.S. ___, 132 S.Ct.

15  2060, 2064 (2012) ( per curiam ) (citation omitted).  "'Circumstantial evidence and inferences

16  drawn from it may be sufficient to sustain a conviction.'"  *Walters v. Maass*, 45 F.3d 1355, 1358

17  (9th Cir. 1995) (citation omitted).

18  If the record supports conflicting inferences, the reviewing court "must presume – even if

19  it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in

20  favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120,

21  133 (2010) (per curiam) ( quoting *Jackson*, 443 U.S. at 326).  In evaluating the evidence

22  presented at trial, this court may not weigh conflicting evidence or consider witness credibility.

23  *Wingfield v. Massie*, 122 F.3d 1329, 1332 (10th Cir. 1997).  Instead, as noted above, the Court

24  must view the evidence in the "light most favorable to the prosecution," *Jackson*, 443 U.S. at 319.

25  Juries have broad discretion in deciding what inferences to draw from the evidence

26  presented at trial.  This court may not "impinge[ ] on the jury's role as factfinder," or engage in

27  "fine-grained factual parsing." *Johnson*, 132 S.Ct. at 2065.  As the Ninth Circuit has explained,

28  "[t]he relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but

1    whether the jury could reasonably arrive at its verdict." *United States v. Mares*, 940 F.2d 455,

2    458 (9th Cir. 1991).  Under *Jackson*, the Court need not find that the conclusion of guilt was

3    compelled, only that it rationally could have been reached.  *Drayden v. White*, 232 F.3d 704, 709-

4    10 (9th Cir. 2000).

5         "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

6    the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

7    *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  Because this case is governed by the

8    AEDPA, this court owes a "double dose of deference" to the decision of the state court.  *Long v.*

9    *Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (quoting *Boyer v. Belleque*, 659 F.3d 957, 960 (9th

10   Cir. 2011)).  *See also Johnson*, 132 S.Ct. at 2062 ("*Jackson* claims face a high bar in federal

11   habeas proceedings because they are subject to two layers of judicial deference."); *Kyzar v. Ryan*,

12   780 F.3d 940, 943 (9th Cir. 2015) (same).

13                    **2.  Arming Allegations**

14        Petitioner claims that the evidence is insufficient to support his conviction for being armed

15   with a firearm in connection with the three charged conspiracies: conspiracy to transport cocaine

16   for purposes of sale between non-contiguous counties; conspiracy to transport and sell cocaine;

17   and conspiracy to sell and transport methamphetamine.  ECF No. 17 at 114-17.  He claims, in

18   essence that there was insufficient evidence that he actually possessed or used the firearm during

19   any of the alleged conspiracies.  Petitioner made these same arguments on direct appeal.  Resp't's

20   Lodg. Doc. entitled "Third Appellate District Court of Appeal, Appellant's Opening Brief, June

21   5, 2006," at 72-76.

22        The California Court of Appeal rejected these arguments, reasoning as follows:

23              **Sufficiency of Evidence that Villasenor was Armed**

24              Penal Code section 12022, subdivision (a)(1), provides for an
              additional term of one year if the defendant was "armed with a
25              firearm in the commission of a felony . . . ."  Here, the jury found
              Villasenor was armed in the commission of three different
26              conspiracies.  That trial court sentenced Villasenor to an additional
              year as to each of those conspiracies, based on the true finding of
27              the arming allegations.

28

                                    19

Villasenor contends there is insufficient evidence to support the true finding on each of the arming allegations.   We conclude the contention is without merit.

**A.  Allegations and Facts**

The conspiracy counts as to which the jury found that Villasenor was armed with a firearm were alleged to have taken place:

(1) from January 1, 2002, to May 16, 2002 (count one);

(2) from April 1, 2002, to May 16, 2002 (count four); and

(3) from April 1, 2002, to May 16, 2002 (count five).

The facts directly related to the firearm that Villasenor was alleged to have possessed during the conspiracies consist of two incidents: (1) a telephone call in which Villasenor stated he was taking the firearm to a funeral and (2) the discovery of the firearm in a GMC Yukon in front of Villasenor's residence.

**1.  Telephone Call**

On April 11, 2002, Villasenor received a call from Mark Montez, to whom Villasenor referred as "Uncle Mark."  Montez had been to a funeral which Villasenor had not attended.   When Montez told Villasenor the gathering was still in progress, Villasenor said he was going.  Montez asked Villasenor who he was going with, and Villasenor replied: "myself, my 380."  Montez asked "who"?  And Villasenor told him, "my 38."[5]

The day after the call in which Villasenor told Montez that he was taking his firearm to a funeral, Montez reported to Villasenor and Jesse Vasquez that he had discovered surveillance on the organization by law enforcement.  Montez advised Vasquez, who apparently had been followed that morning, not to do anything.

**2.  GMC Yukon**

The GMC Yukon was seen on several occasions by deputies conducting surveillance of the organization, including at the automobile body shop where the Concorde was being fitted for a secret compartment and in front of Villasenor's residence in West

---

[5]   Villasenor argues that, because there was some ambiguity concerning whether he was referring to a .38 or a .380, the jury was required to resolve the ambiguity by finding he was referring to a .380, the more innocent explanation considering the later discovery of a .38 in a vehicle associated with Villasenor.  (See CALJIC No. 2.01 [jury must adopt interpretation that points to innocence].)  To the contrary, Villasenor fails to draw our attention to any evidence presented to the jury that there was a difference between a .380 and a .38, and we draw the inference most favorable to the verdict.  (*In re James D.* (1981) 116 Cal.App.3d 810, 813.)  Furthermore, the jury may have found no ambiguity at all if it concluded that defendant was correcting what he perceived as an erroneous reference to a "380" when he said "my 38."

20

Sacramento. At least once, Villasenor was seen driving the Yukon. On May 16, 2002, a search was conducted of Villasenor's West Sacramento residence. The Yukon was parked in the driveway of the house, and Villasenor, Shonda Chadree (also a resident), and two little children were the only occupants of the residence at the time.

A loaded .38 caliber revolver was found in the center console of the Yukon. Also found in the Yukon were papers bearing Villasenor's name and names of five other people.

**B. Sufficiency of Arming Evidence**

We review a claim of insufficiency of evidence by viewing the evidence in the light most favorable to the verdict and drawing every reasonable inference in favor of the verdict. If the verdict is supported by reasonable and credible evidence of solid value, we defer to the finder of fact. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

The arming enhancement pursuant to section 12022, subdivision (a)(1) is designed to deter use of a firearm because the very presence of a firearm at the scene of a crime increases the chances of death or injury. (*People v. Bland* (1995) 10 Cal.4th 991, 996.) "To trigger the enhancement, the defendant need only have a gun 'available for use to further the commission of the underlying felony.' [Citation.] Moreover, when the underlying felony is a continuing offense, it is sufficient if the defendant has a gun available at any time during the felony to aid in its commission. [Citation.]" (*People v. Becker*, (2000) 83 Cal.App.4th 294, 297, quoting *People v. Bland, supra*, at p. 999.) Conspiracy is a continuing offense subject to this rule. (*Id.* at pp. 297-298.) "The classification of conspiracy as a continuing offense is important because, as noted, the period during which the arming enhancement may attach to such an offense is very broad: So long as the defendant has a weapon available for use at any point during the course of a continuing offense, his sentence may be enhanced for being armed. [Citations.]" (*Id.* at p. 298.)

The evidence here supports a reasonable inference that Villasenor was in possession of the .38 caliber revolver during the period of each conspiracy. Both of the incidents (the April 11 statement that he was taking his firearm to a funeral and the May 16 discovery of the firearm in the Yukon) occurred during each of the conspiracies, the latest of which started on April 1 and ended May 16.

Villasenor contends that "the prosecution failed to produce any evidence to use in any drug deal or to aid him during the 3 conspiracies he was convicted of." To the contrary, the conspiracies were continuing crimes, occurring through the periods alleged. Villasenor had a firearm during that time, and it is reasonable to infer that he possessed it to further the conspiracies. By their nature, the conspiracies to traffic in controlled substances were fraught with danger. (*See People v. Duarte* (2007) 147 Cal.App.4th 1231, 1237 (Villasenor's

coconspirator's case; drug trade fraught with danger].)  From the fact that Villasenor possessed a firearm as a prominent actor during these conspiracies, the jury could reasonably infer that he possessed it to protect himself, other conspirators, the controlled substances, and any assets from dangers or perceived dangers arising from the conspiracy.  It was unnecessary to show that he used the firearm in any specific way, such as during a drug deal.

Citing a case in which a defendant transported a victim away from the location of his own firearm before raping her (*People v. Jackson*, (1995) 32 Cal.App.4th 411, 421), Villasenor asserts he cannot be held criminally liable under the arming enhancement because there was no evidence the firearm was ever near any controlled substances or money.  But a conspiracy is significantly different from a rape.  It was unnecessary to show that Villasenor possessed the firearm in proximity to the controlled substances that were the object of the conspiracy.  It was the agreement and the execution of the agreement for which Villasenor was convicted, not any particular possession of controlled substances.  "What is important is that defendants [here, Villasenor] had a gun available during the commission of the conspiracy and that the gun's presence created an added risk of death or injury.  That is enough to justify the arming enhancement."  (*People v. Becker, supra*, 83 Cal.App.4th at p. 298.)

Resp't's Notice of Lodging, "Third Appellate District Court of Appeal, Partially Published Opinion, March 11, 2008," at 39-43.

For the reasons expressed by the California Court of Appeal, a rational jury could have found beyond a reasonable doubt that petitioner was armed with a firearm during the commission of the three conspiracies, pursuant to Cal. Penal code § 12022(a)(1).  The decision of the state appellate court rejecting petitioner's claim in this regard is not contrary to or an unreasonable application of *In re Winship* to the facts of this case.  Certainly the decision is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to federal habeas relief on his claim that the evidence is insufficient to support his conviction for being armed with a firearm in connection with the three conspiracies charged against him.

### 3. <u>Transportation Conviction</u>

Petitioner's next claim is that the evidence is insufficient to support his conviction for conspiring to transport cocaine between non-contiguous counties.  ECF No. 17 at 118-119.  He

1   argues that the evidence shows he was importing cocaine into California from Texas, and not

2   between non-contiguous counties in California.  *Id.* at 118.  Petitioner also argues that he should

3   have been charged with "the specific offense of conspiring to import cocaine," and not with

4   conspiring to transport cocaine.  *Id.* at 118.  He argues that charging him with conspiring to

5   *transport* cocaine, and not conspiring to *import* cocaine, "allows the general statute to prevail

6   over the specific statute," in violation of California law.  *Id.* at 119.

7        The California Court of Appeal rejected these arguments, reasoning as follows:

8            Villasenor contends, citing *In re Williamson* (1954) 43 Cal.2d 651,
9        that his conviction in count one for conspiring to transport cocaine
         between noncontiguous counties must be reversed because he
10       committed the more specific offense of conspiracy to transport (or
         import) cocaine from outside of the state.  *In re Williamson*,
11       however, is inapplicable to this case, and Villasenor's contention
         fails because importation of cocaine is not a more specific offense
12       than transportation between noncontiguous counties.

13           The two statutory provisions at issue in Villasenor's contention that
         prohibit transportation of cocaine are both found in Health and
14       Safety Code section 11352.  Subdivision (a) provides that "every
         person who transports, imports into this state, sells, furnishes,
15       administers, or gives away . . . any controlled substance . . . shall be
         punished by imprisonment in the state prison for three, four, or five
16       years."  Subdivision (b) states:  "Notwithstanding the penalty
         provisions of subdivision (a), any person who transports for sale
17       any controlled substances . . . within this state from one county to
         another noncontiguous county shall be punished by imprisonment
18       in the state prison for three, six, or nine years."

19           The conspiracy for which Villasenor was convicted in count one
         involved the transportation of controlled substances, by car, through
20       southern California to Sacramento.  Therefore, it was a conspiracy
         to violate both subdivisions of Health and Safety Code section
21       11352 because it would import cocaine into the state (subd. (a)) and
         then transport the cocaine between noncontiguous counties (subd.
22       (b)).

23           When two statutes conflict, the more specific statute prevails over
         the general statute.  (*See In re Williamson, supra*, 43 Cal.2d at p.
24       654.)  Put differently, "when the Legislature has enacted a specific
         statute addressing a specific matter, and has prescribed a sanction
25       therefor, the People may not prosecute under a general statute that
         covers the same conduct, but which prescribes a more severe
26       penalty, unless a legislative intent to permit such alternative
         prosecution clearly appears.  [Citation.]"  (*Mitchell v. Superior
27       Court*, (1989) 49 Cal.3d 1230, 1250, italics and fn. omitted.)

28           Villasenor argues that the more specific provision between the two
         subdivisions is (a).  He asserts: "While subdivision (a) discusses

23

transportation, importation, and sale, under these facts it is clear that the conduct engaged in was importation, as the cocaine was to come from Texas. Specifically, the statute applies to any 'person who . . . imports into this state" cocaine. This specific provision of the statute governs over the general provision, transportation."

The flaw in Villasenor's argument is that subdivision (a) of Health and Safety Code section 11352 is not more specific than subdivision (b). Subdivision (a) states the general proscription on any transportation of controlled substances, including importation, and provides for terms of three, four, or five years. Subdivision (b) provides for greater terms (three, six, or nine years) if the violation of subdivision (a) involves transportation between noncontiguous counties, "[n]otwithstanding the penalty provisions of subdivision (a) . . . ." Therefore, under this statutory scheme, subdivision (b) is the specific statute and there was no error in conviction Villasenor of conspiracy to violate subdivision (b) under the circumstances here in which the conspiracy was to violate both subdivisions (a) and (b).

Villasenor contends that this interpretation of subdivisions (a) and (b) of Health and Safety Code section 11352 is impermissible because it renders meaningless the inclusion of importation in subdivision (a). This contention is without merit because it is possible to import controlled substances into California without transporting it between noncontiguous counties. Villasenor makes this point, himself, when he argues, in the next contention considered in this opinion, that the evidence of a conspiracy to transport cocaine between noncontiguous counties was insufficient because it could have been the intent of the conspirators to transport the cocaine through the Tahoe area and counties contiguous to Sacramento County. The inclusion of importation in subdivision (a) is not rendered meaningless by our interpretation of subdivisions (a) and (b) together.

Accordingly, Villasenor's contention that his conviction for conspiracy to violate Health and Safety Code section 11352, subdivision (b) is contrary to the law as established in *In re Williamson, supra*, 43 Cal.2d 651, is without merit.

Resp't's Notice of Lodging, "Third Appellate District Court of Appeal, Partially Published Opinion, March 11, 2008," at 44-46.

The decision of the California Court of Appeal on this claim of insufficient evidence is based entirely on its interpretation of state law. "State courts are the ultimate expositors of state law," and a federal habeas court is bound by the state's construction except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). The United States Supreme Court has "repeatedly held that it is not the province of a federal habeas court to reexamine state-court determinations on state-

law questions." *Waddington v. Sarausad*, 555 U.S. 179, 129 S.Ct. 823, 832 n.5 (2009). *See also Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("[A] mere error of state law . . . is not a denial of due process") (quoting *Engle v. Isaac*, 456 U.S. 107, 121, n. 21 (1982) and *Estelle v. McGuire*, 502 U.S. 62, 67, 72-73 (1991)). Rather, "a state court's interpretation of state law . . . binds a federal court sitting in federal habeas." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). *See also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law . . . .") The conclusion reached by the California Court of Appeal is not an obvious subterfuge to evade the consideration of a federal issue. Therefore, it is binding on this court.

### 4. Conspiracy Conviction

In his next ground for relief, petitioner claims that the evidence introduced at his trial was insufficient to support his conviction for conspiracy to transport a controlled substance between noncontiguous counties. Petitioner raised the same claim on direct appeal. The California Court of Appeal summarized petitioner's arguments, and its ruling thereon, as follows:

> Villasenor asserts the evidence was insufficient to support the conviction on count one for conspiracy to transport a controlled substance between noncontiguous counties. He argues that the conclusion that the conspirators agreed to transport the controlled substance through any California county that is not contiguous to Sacramento County is based on speculation, not evidence or reasonable inferences from the evidence. We disagree. The evidence and reasonable inferences drawn from the evidence are sufficient to sustain the conviction.

> **A. Facts**

> In January 2002, Jesse Vasquez, one of the conspirators, hired Sandra Cortez to drive a Jaguar from Texas to California. He instructed her on the route to take. She entered California on Interstate 10 and went through Los Angeles on her way to Sacramento. In February 2002, Cortez drove the Jaguar, in which a hidden compartment had been installed, back to Texas at Vasquez's direction. In Texas, Vasquez took the Jaguar from Cortez, then returned it several days later with instructions on the route to take back to Sacramento. Cortez drove the Jaguar back to Sacramento, entering California at Needles. The back end of the Jaguar was heavy, causing difficulty in steering.

> In April 2002, Vasquez hired Joseph Duarte to drive the Concorde to Texas and back. They agreed that Duarte would go to Riverside County and pick up his seven-year-old son from the boy's mother and take him on the trip to and from Texas. Duarte left Southern California and went to Texas, driving through Arizona and New

Mexico.  While in Texas, Duarte talked to Vasquez by telephone for instructions.  Duarte finally got cold feet and left Texas without the Concorde.  On May 16, the Concorde was tracked leaving San Antonio.  Law enforcement executed a stop as the Concorde was heading for Interstate 10.

Villasenor asserts that this last trip was directed by Anthony Luna, known to the conspirators as "Bad Breath," not Jesse Vasquez, who directed the other trips.  However, the portions of the reporter's transcript that Villasenor cites for this proposition establish only that Luna was involved with the Concorde while it was in Texas, not that he picked the route the Concorde would take back to Sacramento.  Other evidence established that Vasquez was still in charge of the Texas operation.  For example, Vasquez called and spoke to Duarte, trying to convince him to drive the Concorde back to Sacramento.

This last trip was the subject of the conspiracy alleged in count one with the weight enhancement for the 49 kilograms of cocaine.

**B.  Intent to Transport Between Noncontiguous Counties**

To sustain a conviction for conspiracy, the evidence and reasonable inferences drawn from the evidence must show that the conspirators intended to agree and intended to commit the elements of the target offense.  (*People v. Swain* (1996) 12 Cal.4th 593, 600.)   The prosecution may prove the conspiracy by inferences drawn from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.  (*People v. Cook*, (1983) 141 Cal.App.3d 224, 311.)

The facts here support the inference that the conspirators intended to have the Concorde return to Sacramento through southern California, thus transporting the controlled substances between noncontiguous counties.  Through southern California is the only route the conspirators had used.   There is no evidence the conspirators intended to go by any other route on the last trip.  The occupants of the Concorde and Jaguar were headed on a direct route to Interstate 10 when they were stopped, and Interstate 10 enters California in the south, making it necessary to travel through counties noncontiguous to Sacramento County.

Citing to evidence that it is possible to get controlled substances to Sacramento from Texas without going through a California county that is not contiguous to Sacramento County, Villasenor claims we cannot conclude the evidence was sufficient to sustain a conviction for conspiracy to transport a controlled substance between noncontiguous counties because the plan may have been to take that route.  If the Concorde were to travel up through Nevada and into California through El Dorado County, which is contiguous to Sacramento County, there would be no violation of Health and Safety Code section 11352, subdivision (b).  A possibility that the cocaine could have been imported through El Dorado County, however, does not prevent a finding that there was substantial

evidence that the conspirators intended to transport the controlled substance through southern California.

Villasenor asserts that only speculation supports the conclusion that the conspirators intended to transport the controlled substance through southern California.  In support, he cites *People v. Raley* (1992) 2 Cal.4th 870, at pages 889 through 891 (*Raley*).  In *Raley*, the Supreme Court reviewed the defendant's conviction for oral copulation and found the evidence was insufficient to sustain the conviction.  (*Id.* at p. 889.)  The defendant held two minors, Jeanine and Laurie, captive and told them they would have to "fool around" with him for five minutes before he would let them go.  He took Jeanine away, and Laurie heard Jeanine scream.  The defendant then came back 15 minutes later and, leaving Jeanine, took Laurie away.  He directed Laurie to orally copulate him.  When she gagged, he directed her to manipulate his penis with her hands until he ejaculated.  (*Id.* at p. 882.)  Jeanine later told someone that the defendant had not raped her but had made her "fool around."  (*Id.* at p. 884.)

As to the defendant's sexual assault on Jeanine, the *Raley* court rejected the argument that layered inferences leading to a conclusion that the defendant orally copulated Jeanine were reasonable.  Specifically, the court found unreasonable the inference that "fool around" referred to oral copulation.  The court stated: "Oral copulation was not the only sexual activity defendant had in mind with his second victim [Laurie]; 'fooling around' seemed to mean several things to him.  It is also speculative to conclude that Jeanine would use the term in the same restricted sense respondent claims defendant intended to convey.  'A reasonable inference, however, "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.  [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.'" [Citation.]" (*Raley, supra*, at pp. 890-891.)

Here, there were alternative ways the conspirators could have transported the controlled substance to Sacramento, not all of which involved transporting the controlled substance through noncontiguous counties.  However, as noted above, the circumstances of this case, including (1) the prior conduct of the conspirators, (2) the fact that the Concorde was heading for Interstate 10, and (3) the lack of evidence that the conspirators considered using any other route, make the inference in favor of the conviction reasonable and distinguish this case from *Raley*.

The evidence was sufficient to support the conviction for conspiracy to transport a controlled substance between noncontiguous counties pursuant to Health and Safety Code section 11352, subdivision (b).

Resp't's Notice of Lodging, "Third Appellate District Court of Appeal, Partially Published Opinion, March 11, 2008," at 47-51.

1    After reviewing the record in the light most favorable to the jury's verdict, this court

2    concludes that there was sufficient evidence introduced at petitioner's trial to support his

3    convictions for conspiracy to transport a controlled substance between noncontiguous counties.

4    In addition to the evidence summarized by the California Court of Appeal, the state court record

5    reflects that petitioner and his co-conspirators wanted the contraband to be imported into

6    Sacramento as soon as possible because their customers were asking for it.  The record also

7    reflects that Interstate 10 through noncontiguous counties in southern California was the fastest

8    route from Texas to Sacramento.  Reporter's Transcript on Appeal (RT) at 794, 919-20.  When

9    the Concorde was stopped by authorities it was heading in the most direct route to Interstate 10.

10   *Id.* at 697.  Under these circumstances, and the circumstances described by the California Court

11   of Appeal, a rational juror could conclude that petitioner and his co-conspirators intended that the

12   drugs would reach Sacramento through noncontiguous counties.  Accordingly, petitioner is not

13   entitled to federal habeas relief on this claim.

14      **D.  Brady Violation**

15      Citing *Brady v. Maryland*, 373 U.S. 83 (1963) and *Franks v. Delaware*, 438 U.S. 154

16   (1978), petitioner claims that his Sixth and Fourteenth Amendment rights to a fair trial and due

17   process were violated by the prosecution's failure to disclose that Larry Kindle was working as a

18   confidential informant in this case.  ECF No. 17 at 123.  Petitioner argues that disclosure of this

19   information would have allowed to him to challenge the issuance of the search warrants for his

20   telephone communications and for the GPS tracking device placed in the Concorde.  *Id.* at 137.

21      Petitioner also contends that the affidavit in support of the search warrants contained

22   "willfully false statements" from Larry Kindle which were "intended to mislead the issuing

23   magistrate and without which probable cause for the warrant could not be established."  *Id.* at

24   130.  Specifically, Petitioner notes that in the affidavit supporting the issuance of a warrant,

25   Detective Kolb stated that a warrant was required because she was unable to infiltrate petitioner's

26   criminal organization through the use of informants.  ECF No. 17 at 133, Clerk's Transcript on

27   Appeal (CT) at 1007.  Petitioner contends that this statement is false because Larry Kindle,

28   Kolb's informant, was an active participant in petitioner's criminal enterprise.  *Id.*  Detective

1   Kolb's affidavit also states that Larry Kindle had observed sales and distribution of marijuana but

2   was not personally involved in those transactions.  ECF No. 17 at 133; CT at 959.  Petitioner

3   states that this is also false.  ECF No. 17 at 133.  He includes his own declaration and the

4   declaration of co-defendant Jason Tolliver, in which they state that Larry Kindle was "a full and

5   trusted member of our 'organization.'"  ECF No. 18, Ex. F at 2.  Petitioner argues:

6   
7   
8
> Larry Kindle was fully aware of and fully involved in whatever criminal activities were conducted by this 'criminal organization' and provided investigators with complete details of this organizations activities.  Therefore there was never a need for any search warrant to be issued in this case.

9   ECF No. 17 at 133.

10   Petitioner also asserts that Detective Kolb was aware of Larry Kindle's involvement in the

11   criminal enterprise.  He claims that Kindle's involvement "was concealed not to protect him from

12   harm but to protect the integrity of the probable cause search warrant affidavits."  *Id.* at 134.  In

13   short, petitioner argues that search warrants were not necessary in this case because investigators

14   could have gotten sufficient information from Larry Kindle.

15   Petitioner also argues that the trial court erred in denying his motion to suppress the

16   information obtained from the search warrants.  *Id.* at 135.  He explains:

17   
18   
19   
20
> In this case a properly held in camera examination of Deputy Kolb would have revealed the existence and identity of Larry Kindle and the roll [sic] he actually played in the investigation, which in turn, would have opened the door to impeaching the veracity of Kolb's warrant affidavit and negated the warrant's probable cause.  The warrant would have been quashed and all evidence derived therefrom suppressed.

21   *Id.* at 136.  Petitioner concedes that the trial court held an evidentiary hearing in connection with

22   his motion to suppress, wherein the court heard evidence about Kindle's role in the case, but he

23   argues that the evidentiary hearing was "a farce and a sham."  *Id.*  Petitioner argues the trial court

24   "should have called Kindle in to be examined in camera."  *Id.* at 137.  He explains, in summary:

25   "Revelation of the identity of Larry Kindle as an informant would have provided the defense with

26   evidence to impeach the veracity of both search warrant affidavits ultimately resulting in all of the

27   evidence derived therefrom being suppressed."  *Id.* at 137.

28   /////

29

In support of these arguments, petitioner cites case law to the effect that where a defendant moves for discovery of an informant's identity, the prosecution must disclose sufficient information to allow the defendant to locate the informer if his testimony would be material to the defense. *See, e.g., Roviaro v. United States*, 353 U.S. 53 (1957); *United States v. Price*, 783 F.2d 1132 (4th Cir. 1986) (where informant was actively involved in the charged crimes, trial court's refusal to compel disclosure of his identity denied defendant a fair trial, requiring reversal); *Eleazer v. Superior Court*, 1 Cal.3d 847 (1970) (due process required the police and prosecutor to undertake reasonable efforts in good faith to locate informer so that either party or the court itself could subpoena him as a witness); *Price v. Superior Court*, 1 Cal.3d 836 (1970) (when it appears from the evidence that an informer is a material witness on the issue of defendant's guilt, the informer's identity should be disclosed if non-disclosure would deprive defendant of a fair trial).

Petitioner raised this claim in his habeas petitions filed in the California Superior Court, Court of Appeal, and Supreme Court.  The Superior Court issued the last reasoned decision on the claim:

> Petitioner claims that the prosecution improperly withheld the identity of a confidential informant used to obtain evidence in the case in violation of *Brady v. Maryland* (1963) 373 U.S. 83.  He claims that had he known this information, he could have challenged the admissibility of evidence obtained from search warrants.
>
> Petitioner alleges that he later learned that the confidential informant was Larry Kindle, who was also involved in the drug trafficking operation.  Petitioner argues that if he knew the confidential informant's identity at trial, he could have impeached statements in affidavits made in support of a warrant to install GPS in a vehicle and wiretap warrant.  In particular, Petitioner contends that there was no basis for an 88-page affidavit requesting a wiretap warrant.  The affidavit stated the detective had difficulty infiltrating the organization, and that there were currently no other available informants who could furnish additional information regarding the organization's drug trafficking, in part, because the organization was close-knit and family run, and highly vigilant of law enforcement surveillance.  Petitioner argues that because the prosecution was working with Kindle as a confidential informant, there was no need to obtain the warrants, because "Kindle was fully aware of and fully involved in whatever criminal activities were conducted by this 'criminal organization' and provided the investigators with the complete details of this organization's activities.  Therefore there was never a need for a search warrant to be issued in this case."  Petitioner similarly argues that Kindle's

availability obviated the need for a warrant to install GPS on a vehicle suspected of transporting drugs.

Petitioner concludes that because Kindle was available to the police, the statements in the warrant affidavits were false and thus, all prosecution evidence obtained therefrom was excludable and inadmissible.  Petitioner suggests that the result of his trial would have changed, had this information been excluded, but does not articulate how.  It is unclear from the record provided how the information obtained in the warrants supported each specific charge.

A reviewing court will not consider a claim in a petition for writ of habeas corpus where that issue was raised and rejected on appeal, unless petitioner can show that (1) clear and fundamental constitutional error strikes at the heart of the trial process; (2) the court lacked fundamental jurisdiction; (3) the court acted in excess of jurisdiction not requiring a redetermination of facts; or (4) a change in law after the appeal affected the petitioner.  (*In re Waltreus*, (1965) 62 Cal.2d 218, 225; *see also In re Harris* (1993) 5 Cal.4th 813, 828.)  Additionally, claims that could have been raised on appeal are not cognizable on habeas corpus.  (*In re Dixon* (1953) 41 Cal.2d 756, 759; *see also Harris, supra*, 5 Cal.4th at 828.)  Further, "not all alleged constitutional defects warrant the opportunity to relitigate the issue on habeas corpus . . . the question of whether evidence was admitted at trial in violation of the Fourth Amendment is not cognizable on habeas corpus."  (*In re Harris, supra*, 5 Cal.4th at 830; *In re Terry* (1971) 4 Cal.3d 911, 926.)

Relief by writ of habeas corpus is available for a *Brady* violation.  (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)  *Brady v. Maryland, supra*, 373 U.S. 83, and subsequent cases have held that the prosecution has the duty to disclose any material exculpatory or impeachment evidence (*Brady v. Maryland, supra,* 373 U.S. at 87; *People v. Salazar, supra*, 35 Cal.4th at 1035, 1042.)  However, failure to disclose evidence is a violation only if the evidence is "material" – meaning that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  (*Kyles v. Whitley* (1995) 514 U.S. 419, 433.)

Although petitioner has attempted to recast his first claim as a *Brady* violation, he is essentially challenging the evidence admitted at trial that was obtained from the search warrants.  Petitioner contested the issuance of the warrants prior to trial, pursuant to *Franks v. Delaware* (1978) 438 U.S. 154.  He also raised Fourth Amendment challenges to the search warrants on appeal.

Petitioner's claim is based upon evidence admitted at trial from the search warrants, allegedly in violation of the Fourth Amendment.  Therefore, it is procedurally barred as not cognizable on habeas corpus.  (*In re Harris* (1995) 5 Cal.4th 813, 830; *In re Terry* (1971) 4 Cal.3d 911, 926.)  Additionally, to the extent that petitioner's Fourth Amendment claims were raised and rejected on the merits on appeal, they are procedurally barred, and no exception to this

31

procedural bar appears.  (*In re Waltreus, supra*, 62 Cal.2d 218, 2225; *see In re Harris, supra*, 5 Cal.4th 813, 829-841; *see also People v. Bradford* (1997) 15 Cal.4th 1229, 1304, 939 P.2d 259.)  Petitioner indicates that his appellate counsel did not raise the specific Fourth Amendment argument he now asserts – that had he learned Kindle's identity, he could have effectively challenged the search warrants.  However, this argument could have been raised on appeal and is barred.  (*In re Dixon* (1953) 41 Cal.2d 756, 759; *see also Harris, supra*, 5 Cal.4th at 828.)

Petitioner also argues that Kindle's identity was "material to the impeachment of the trial testimony of Deputies Kolb, Tarver, and Meadows," and suggests that he could have impeached the testimony of witnesses at trial.  This conclusory allegation fails to state a claim for a *Brady* violation.  For example, petitioner has not identified any incriminatory testimony of the deputies, established how such testimony was incriminating, or demonstrated how he could have impeached such statements.  Accordingly, petitioner has not shown that the disclosure of Kindle's identity would have any exculpatory or impeachment effect, and has thus failed to state a prima facie claim for a *Brady* violation.  (*People v. Duvall, supra*, 9 Cal.4th at 474.)

Resp't's Lodg. Doc. entitled "Sacramento County Order Denying Petition for Writ of Habeas Corpus, April 19, 2010," at 1-4.

In his answer, respondent argues that the California Superior Court's citation to *In re Dixon* constitutes a state procedural bar which precludes this court from addressing the merits of petitioner's *Brady* claim.  ECF No. 43 at 4-5.

As a general rule, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Walker v. Martin*, 562 U.S.___, ___, 131 S. Ct. 1120, 1127 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 56 (2009)).  *See also Maples v. Thomas*, ___U.S.___, ___, 132 S. Ct. 912, 922 (2012); *Greenway v. Schriro*, 653 F.3d 790, 797 (9th Cir. 2011); *Calderon v. United States District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  However, a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim.  *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997); *see also Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002): ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed

1  to the merits if the result will be the same"); *Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004)

2  (noting that although the question of procedural default should ordinarily be considered first, a

3  reviewing court need not do so invariably, especially when the issue turns on difficult questions

4  of state law).  Thus, where deciding the merits of a claim proves to be less complicated and less

5  time-consuming than adjudicating the issue of procedural default, a court may exercise discretion

6  in its management of the case to reject the claims on their merits and forgo an analysis of

7  procedural default.  *See Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998); *Batchelor v.*

8  *Cupp*, 693 F.2d 859, 864 (9th Cir.1982); *see also Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th

9  Cir. 2002) (citing *Lambrix*, 520 U.S. at 525.)  The United States Supreme Court has recently held

10  that California's *Dixon* bar is a well-established and regularly followed state procedural bar that is

11  adequate to bar federal habeas review.  *Johnson v. Lee*, No. 15-789, 2016 WL 3041051 (U.S.

12  May 31, 2016).  However, in an abundance of caution, the court will assume that petitioner's

13  claim is not defaulted and will address it on the merits.

14      Petitioner  relies on *Brady v. Maryland* and *Franks v. Delaware* in support of this claim.

15  In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of

16  evidence favorable to an accused upon request violates due process where the evidence is

17  material either to guilt or to punishment, irrespective of the good faith or bad faith of the

18  prosecution."  373 U.S. at 87.  *See also Bailey v. Rae*, 339 F.3d 1107, 1113 (9th Cir. 2003).  The

19  duty to disclose such evidence is applicable even though there has been no request by the

20  accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and encompasses impeachment

21  evidence as well as exculpatory evidence.  *United States v. Bagley*, 473 U.S. 667, 676 (1985).

22      A *Brady* violation may also occur when the government fails to turn over evidence that is

23  "known only to police investigators and not to the prosecutor."  *Youngblood v. West Virginia*, 126

24  S. Ct. 2188, 2190 (2006) (quoting *Kyles*, 514 U.S. at 437, 438) ("[T]he individual prosecutor has

25  a duty to learn of any favorable evidence known to the others acting on the government's behalf

26  in the case, including the police").  There are three components of a *Brady* violation: "[t]he

27  evidence at issue must be favorable to the accused, either because it is exculpatory, or because it

28  is impeaching; the evidence must have been suppressed by the State, either willfully or

1  inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82

2  (1999).  *See also Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Silva v. Brown*, 416 F.3d 980, 985

3  (9th Cir. 2005).

4       A defendant is prejudiced by a *Brady* violation if the evidence that was not produced is

5  material.  *Strickler*, 527 U.S. at 288-89.  Evidence is material if "'there is a reasonable

6  probability' that the result of the trial would have been different if the suppressed documents had

7  been disclosed to the defense."  *Id.* at 289.  "The question is not whether petitioner would more

8  likely than not have received a different verdict with the evidence, but whether "in its absence he

9  received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Id.*

10 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434  (1995)).  *See also Silva*, 416 F.3d at 986 ("a *Brady*

11 violation is established where there 'the favorable evidence could reasonably be taken to put the

12 whole case in such a different light as to undermine confidence in the verdict.'")  "Materiality

13 pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial."

14 *United States v. Agurs*, 427 U.S. 97, 112 n. 20 (1976).  Once the materiality of the suppressed

15 evidence is established, no further harmless error analysis is required.  *Kyles*, 514 U.S. at 435-36;

16 *Silva*, 416 F.3d at 986.  "When the government has suppressed material evidence favorable to the

17 defendant, the conviction must be set aside."  *Silva*, 416 F.3d at 986.

18      In *Franks*, the Supreme Court held that:

19
20       where the defendant makes a substantial preliminary showing that a
         false statement knowingly and intentionally, or with reckless
21       disregard for the truth, was included by the affiant in the warrant
         affidavit, and if the allegedly false statement is necessary to the
22       finding of probable cause, the Fourth Amendment requires that a
         hearing be held at the defendant's request.  In the event that at that
23       hearing the allegation of perjury or reckless disregard is established
         by the defendant by a preponderance of the evidence, and, with the
24       affidavit's false material set to one side, the affidavit's remaining
         content is insufficient to establish probable cause, the search
25       warrant must be voided and the fruits of the search excluded to the
         same extent as if probable cause was lacking on the face of the
         affidavit.

26 *Franks*, 438 U.S. at 155-156.

27      As the California Superior Court pointed out, although petitioner frames his arguments as

28 a *Brady* claim, he is actually challenging the admission at his trial of evidence that

1    was obtained from the search warrants.  For the reasons explained above, petitioner's Fourth

2    Amendment argument is barred by *Stone v. Powell*.

3         As for *Brady*, respondent argues that there was no *Brady* violation in this case because the

4    defense already knew prior to trial that Larry Kindle was a government informant.  Respondent

5    points to the following statements made by counsel for Jason Tolliver prior to jury selection:

6             Now, I would like really for us to stop pretending that he's not an
              informant, pretending that he didn't give statements to law
7             enforcement.  He did do all of that.  We have known it from the
              beginning in this case, months ago.  I told [the prosecutor] we know
8             that.  It's obvious.

9             At the suppression motion, you know, somehow the car that was in
              Kindle's possession mysteriously appeared someplace so that the
10            officers could put the GPS in it.  Everybody knew it was Kindle.

11   RT at 210-11.

12        "Where the defendant is aware of the essential facts enabling him to take advantage of any

13   exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the

14   evidence to the attention of the defense."  *United States v. Brown*, 582 F.2d 197, 200 (2d Cir.

15   1978).  *See also United States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985) (citing *Brown*);

16   *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) ("Where defendants . . . had within

17   their knowledge the information by which they could have ascertained the supposed *Brady*

18   material, there is no suppression by the government"); *United States v. Cleveland*, No. CR.A. 96-

19   207, 1997 WL 313420, *1 (E.D. La. June 10, 1997) ("there is no *Brady* violation when the

20   Government fails to turn over a witness' statements containing possibly exculpatory statements

21   where the defense is aware of the witness and is free to question him in anticipation of trial").

22   The statements of defense counsel, cited above, show that the defendants were aware as early as

23   the hearing on the suppression motion that Larry Kindle was a government informant, and

24   therefore could have taken advantage of that knowledge to prosecute the motion.  Under these

25   circumstances, the prosecution did not commit a *Brady* violation in failing to disclose that Larry

26   Kindle was an informant.

27        In the context of federal criminal trials, the Government has a "privilege to withhold from

28   disclosure the identity of persons who furnish information" regarding illegal activity.  *Roviaro v.*

1    *United States*, 353 U.S. 53, 59 (1957).  A defendant can overcome this privilege if he

2    demonstrates that disclosure "is relevant and helpful to [his] defense" or "is essential to a fair

3    determination" of his guilt.  *Id.* at 60–61.  A criminal defendant's "mere suspicion" that the

4    informant's evidence is "relevant and helpful" under *Brady* will not defeat the Government's

5    privilege under *Roviaro.  See United States v. Henderson*, 241 F.3d 638, 645 (9th Cir. 2001).

6    The United States Supreme Court has stated that "the government's refusal to reveal the identity

7    of an informant does not violate *Brady*."  *United States v. Jones*, 612 F.2d 453, 455 (9th Cir.

8    1979) (citing *Weatherford v. Bursey*, 429 U.S. 545 (1977)).

9         Even if the prosecution's failure to reveal the identity of its informant constituted a *Brady*

10   violation, petitioner has failed to demonstrate prejudice.  Specifically, petitioner has not shown a

11   reasonable probability that the result of the trial would have been different if Kindle's identity had

12   been disclosed to the defense prior to the hearing on the motion to suppress, or at any time, or that

13   the lack of disclosure undermines confidence in the verdict.  As noted by respondent, petitioner

14   did not call Larry Kindle as a witness at trial or at the hearing on the motion to suppress, even

15   though he knew, or at least had a strong suspicion, that Kindle was a government informant.  This

16   indicates that petitioner's trial counsel did not consider Mr. Kindle's testimony to be material to

17   the defense case.

18        In any event, there is no evidence that Kindle would have testified in petitioner's favor at

19   trial, that any testimony would have been relevant to petitioner's defense, or that any information

20   from Kindle would have undermined the search warrant affidavit.  Petitioner does not argue that

21   the information provided by Kindle regarding the criminal activities perpetrated by petitioner and

22   his co-defendants was false or that Kindle himself was unreliable.  Nor is there any evidence that

23   Kindle's testimony would have demonstrated petitioner's innocence.  Finally, whether the trial

24   court erred in denying petitioner's discovery motion is not a cognizable claim in a federal habeas

25   action. See *Estelle*, 502 U.S. 62, 67 (1991); *Gupta v. Beard*, No. CV 14-1709, 2015 WL 1470859

26   (C.D. Cal. March 30, 2015); *Carrion v. McDonald*, No. CV 11–8705–GHK (RNB), 2012 WL

27   6840585, at *28 (C.D. Cal. Aug. 24, 2012) (alleged violation of California criminal discovery

28   statutes is not cognizable on federal habeas review).  The Supreme Court has held "[t]here is no

general constitutional right to discovery in a criminal case." *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1996).

For all of the reasons set forth above, petitioner is not entitled to federal habeas relief on his *Brady* claim.

## E.  Ineffective Assistance of Appellate Counsel

In his last ground for relief, petitioner claims that his appellate counsel rendered ineffective assistance.  He argues that appellate counsel:

> raised claims challenging the trial court's ruling on the veracity of the search warrants in this case yet did no investigation regarding the trial court's denial of the discovery of the identity of informants which would have established the fact of false and misleading statements contained in the warrant affidavits.  Establishing this fact undermined the credibility of all of the prosecution's evidence in this case upon which conviction and judgment are based.

ECF No. 17 at 141.

The California Superior Court denied this claim, reasoning as follows:

> For a petitioner to show ineffective assistance of counsel, he must first "show counsel's performance was 'deficient' because his or her 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.'"  (*In re Harris, supra*, 5 Cal.4th at 833 (citing *Strickland v. Washington* (1984) 466 U.S. 668 and *People v. Pope* (1979) 23 Cal.3d 412).)  In applying the first part of this test, courts must be highly deferential.  A petitioner claiming ineffective assistance of counsel must overcome a presumption that, considering all of the circumstances, counsel's actions "might be considered sound trial strategy."  (*Strickland, supra*, 466 U.S. at 689.)
>
> Second, petitioner "must also show prejudice flowing from counsel's performance or lack thereof.  [Citation]  Prejudice is shown where there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding could have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  (*In re Harris, supra*, 5 Cal.4th at 833 (citing *Strickland, supra*, 466 U.S. at 689.).)
>
> Petitioner has failed to allege sufficient facts in support of his ineffective assistance of counsel claim.  He acknowledges that his appellate counsel challenged the trial court's ruling on the wiretap warrant, and the warrant to seize his car to reinstall GPS.  Petitioner contends that his counsel failed to "investigate' or presumably challenge the trial court's denial of his discovery motion regarding the identity of the confidential informant.  Petitioner implies that had appellate counsel done so, he could have (1) established that the warrants were really based on the false statements in the

affidavit that a warrant was needed, because Kindle could have provided the prosecution with the necessary information, (2) "undermined the credibility of all of the prosecution's evidence," and (3) thus changed the outcome of his appeal.

There is no evidence that the appellate counsel's failure to advance petitioner's theory fell below an objective standard of reasonableness or prejudiced the outcome of the appeal. One warrant sought to intercept the phone communications of four phones used by three individuals, including petitioner. The other warrant sought to install a GPS device on a vehicle that was suspected of being used to transport drugs.

Petitioner's only challenge to the warrants is that they lacked probable cause because the prosecution could have gotten this evidence from Kindle. It is difficult to see how Kindle's participation could have furnished the prosecution with the evidence obtained from the warrants – conversations from other individuals and real-time information about the whereabouts of the vehicle. Aside from his arguments about Kindle's availability to the prosecution, petitioner does not otherwise challenge the probable cause for such warrants. Petitioner's counsel could have reasonably concluded that a challenge based on petitioner's theory would not be successful.

Further, neither the petition, nor the record provided demonstrates how the information from the warrants was relevant to his convictions or how the exclusion of such information would have altered the outcome of petitioner's case. Accordingly, petitioner has failed to state a prima facie cause for relief regarding ineffective assistance of counsel.

Resp't's Lodg. Doc. entitled "Sacramento County Order Denying Petition for Writ of Habeas Corpus, April 19, 2010," at 4-5.

The clearly established federal law for ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88. (quoting *Strickland*, 466 U.S. at 687).

/////

1    A reviewing court is required to make every effort "to eliminate the distorting effects of

2    hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

3    conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669; *see Richter*, 131

4    S.Ct. at 789.  Reviewing courts must also "indulge a strong presumption that counsel's conduct

5    falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

6    This presumption of reasonableness means that the court must "give the attorneys the benefit of

7    the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel

8    may have had for proceeding as they did." *Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388,

9    1407 (2011) (internal quotation marks and alterations omitted).

10    Prejudice is found where "there is a reasonable probability that, but for counsel's

11    unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

12    U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

13    outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable."

14    *Richter*, 131 S.Ct. at 792.

15    Under AEDPA, "[t]he pivotal question is whether the state court's application of the

16    Strickland standard was unreasonable." *Id.* at 785.  "[B]ecause the *Strickland* standard is a

17    general standard, a state court has even more latitude to reasonably determine that a defendant has

18    not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

19    The Strickland standards apply to appellate counsel as well as trial counsel. *Smith v.

20    Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).

21    However, an indigent defendant "does not have a constitutional right to compel appointed counsel

22    to press nonfrivolous points requested by the client, if counsel, as a matter of professional

23    judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

24    Counsel "must be allowed to decide what issues are to be pressed." *Id.*  Otherwise, the ability of

25    counsel to present the client's case in accord with counsel's professional evaluation would be

26    "seriously undermined." *Id.  See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998)

27    (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and is not even

28    particularly good appellate advocacy.")  There is, of course, no obligation to raise meritless

39

1    arguments on a client's behalf.  *See Strickland*, 466 U.S. at 687-88 (requiring a showing of

2    deficient performance as well as prejudice).  Thus, counsel is not deficient for failing to raise a

3    weak issue.  *See Miller*, 882 F.2d at 1434.  In order to establish prejudice in this context,

4    petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on

5    appeal.  *Id.* at 1434 n.9.

6         Petitioner claims, in essence, that his appellate counsel rendered ineffective assistance in

7    failing to investigate whether the trial court erred in denying his request for discovery of the

8    identity of the government's confidential informant.  He argues that such an investigation would

9    have established that some of Detective Kolb's assertions in the affidavit supporting the search

10   warrants were false, such as her assertion that a warrant was required because she was unable to

11   infiltrate petitioner's criminal organization through the use of informants, and that Larry Kindle

12   had observed sales and distribution of marijuana but was not personally involved in those

13   transactions.  Petitioner refers to the allegations contained in his claim that the prosecution

14   committed a *Brady* violation in failing to disclose that Larry Kindle was its informant.  Petitioner

15   reasons that if he had been able to discover that Larry Kindle was the informant, he would have

16   prevailed on his motion to suppress the evidence obtained from the search warrants, which would

17   have "undermined the credibility of all of the prosecution's evidence in this case upon which

18   conviction and judgment are based."  ECF No. 17 at 141.

19        The California Superior Court rejected these arguments, reasoning that petitioner had

20   failed to demonstrate prejudice.  The Superior Court noted that it was "difficult to see" how

21   petitioner's knowledge that Kindle was a government informant would have resulted in a

22   different outcome at trial, thereby supporting a meritorious appellate claim.  This court agrees.

23   Petitioner has failed to demonstrate how earlier discovery of information that Larry Kindle was a

24   government informant would have resulted in the suppression of evidence obtained from the

25   search warrant or otherwise changed the outcome of his trial.  Petitioner's conclusory statement

26   that knowing this information would have "undermined the credibility of all of the prosecution's

27   evidence in this case" is insufficient to support his ineffective assistance claim.  *See Jones v.*

28   *Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) ("'Conclusory allegations which are not supported by a

1   statement of specific facts do not warrant habeas relief'") (quoting *James v. Borg*, 24 F.3d 20, 26

2   (9th Cir. 1994)).

3       Petitioner has failed to establish that the state courts' rejection of his claim of ineffective

4   assistance of appellate counsel was objectively unreasonable.  Appellate counsel's decision not to

5   investigate or pursue a claim based on the disclosure of Larry Kindle's identity as a government

6   informant, but instead to focus on claims that counsel believed were more meritorious, was

7   "within the range of competence demanded of attorneys in criminal cases." *McMann v.*

8   *Richardson*, 397 U.S. 759, 771 (1970).  Accordingly, petitioner is not entitled to relief on his

9   claim that his appellate counsel rendered ineffective assistance.

10   **IV.  Conclusion**

11       Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

12   habeas corpus be denied.

13       These findings and recommendations are submitted to the United States District Judge

14   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

15   after being served with these findings and recommendations, any party may file written

16   objections with the court and serve a copy on all parties.  Such a document should be captioned

17   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

18   shall be served and filed within fourteen days after service of the objections.  Failure to file

19   objections within the specified time may waive the right to appeal the District Court's order.

20   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

21   1991).  In his objections petitioner may address whether a certificate of appealability should issue

22   in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

23   2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

24   final order adverse to the applicant).

25   DATED:  June 8, 2016.

26                         EDMUND F. BRENNAN

27                         UNITED STATES MAGISTRATE JUDGE

28